IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 3:12-3639-CMC |
| v. | ) | |
| | ) | |
| WEYLCHEM US, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff, the United States of America, by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), files this Complaint and alleges that:

### NATURE OF ACTION

1.  This is a civil action brought against WeylChem US Inc. ("Defendant") to obtain injunctive relief and civil penalties.  This action is brought pursuant to Section 113(b) of the Clean Air Act ("CAA"), 42 U.S.C. § 7413(b), for violations of federal emissions standards promulgated by EPA pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, and set forth at: 40 C.F.R. Part 63 (national emissions standards for hazardous air pollutants for source categories), Subparts  GGG (pharmaceuticals production), MMM (pesticide active ingredient production) and FFFF (miscellaneous organic chemical manufacturing or MON);  and Part 61 (national emission standards for hazardous air pollutants), Subparts J (Equipment Leaks (fugitive emission sources) of benzene) and FF (benzene waste operations).  WeylChem is also in violation of its operating permit issued pursuant to Title V of the CAA, 42 U.S.C. §§ 7661-7661f.  This action is also brought

pursuant to Section 3008(a) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6928(a), for violations of RCRA Section 3005(a), 42 U.S.C. § 6925(a), and federal regulations promulgated at 40 C.F.R. Parts 260 through 279; and the South Carolina Hazardous Waste Management Act 44-56-30 et seq. and the South Carolina Hazardous Waste Management Regulations, R.61-79.260 through 279. This action is also brought pursuant to Section 309 (b) of the Clean Water Act ("CWA"), 33 U.S.C. § 1319(b), for violations of the terms of Defendant's National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, and for discharges without a permit in violation of Section 301 of the CWA, 33 U.S.C. § 1311.

<u>JURISDICTION AND VENUE</u>

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1345 and 1355, as well as Section 113(b) of the CAA, 42 U.S.C. § 7413(b); Section 3008(a) of RCRA, 42 U.S.C. §6928(a); and Section 309(b) of the CWA, 33 U.S.C. § 1319(b).

3.       Venue is proper in this district pursuant to 28 U.S.C. §§1391(b) and (c), and 1395; CAA Section 113(b), 42 U.S.C. § 7413(b); RCRA Section 3008(a)(1), 42 U.S.C. §6928(a)(1); and CWA Section 309(b), 33 U.S.C. § 1319(b), because the violations complained of and the claims asserted herein arose in this district, and because defendant WeylChem US, Inc. ("WeylChem") conducts business at facilities located in this district.

4.      Authority to bring this action is vested in the United States Department of Justice pursuant to Section 305 of the CAA, 42 U.S.C. § 7605, and 28 U.S.C. §§ 516 and 519.

5.      Notice of the commencement of this action has been given to the State of South Carolina in accordance with CAA Section 113(b), 42 U.S.C. § 7413(b); RCRA Section 3008(a)(2), 42 U.S.C. §6928(a)(2); and CWA Section 309(b), 33 U.S.C. § 1319(b).

## DEFENDANT

6.      WeylChem is a corporation organized and existing under the laws of Minnesota and is licensed to do business in the State of South Carolina. The corporation has been known under a variety of names since its founding in 1967, including Clariant Life Science Molecules (America) Inc. and Elgin Fine Chemicals.  The defendant has been known as Weylchem since 2008.

7.      WeylChem owns and operates a specialty chemical manufacturing facility in Elgin, South Carolina (the "Elgin facility") and a wastewater treatment plant in Lugoff, South Carolina , on the Wateree River (the "Wateree facility" or the "Lugoff facility") .

8.      WeylChem is a "person" within the meaning of CAA Section 302(e), 42 U.S.C. § 7602(e); RCRA Section 1004(15), 42 U.S.C. §6903(15); S.C. Code Ann. § 44-56-60(b), and CWA Section 502(5), 33 U.S.C. § 1362(5).

## THE FACILITIES

9.      The Elgin facility is located at 2114 Larry Jeffers Road, South Carolina, on property of approximately 270 acres.  There are numerous buildings on the site that have, since 1967, produced chemicals such as pharmaceutical intermediates, pesticide active ingredients, film active ingredients, agriculture intermediates and more.  It is a batch process operation. The Standard Industrial Classification (SIC) Code for the facility is 2869 (Industrial Inorganic Chemicals).

3

10.     The Wateree facility is located approximately 12 miles away from and operates exclusively to treat the wastewater generated by the Elgin facility.  Tanker trucks drive approximately 11 miles over public roads approximately 30-40 times a day delivering wastewater for treatment and discharge to the Wateree River.  Approximately 3.5 to 5 million gallons a month are delivered to Wateree for treatment and discharge.

## STATUTORY BACKGROUND

**CAA**

11.     The primary purpose of the CAA is to protect and enhance the quality of the nation's air resources so as to promote the public health and welfare and the productive capacity of its population.  42 U.S.C. § 7401(b)(1).

### National Emission Standards for Hazardous Air Pollutants

12.     Section 112(d)(1) of the CAA, 42 U.S.C. § 7412(d)(1), requires the Administrator of the EPA to promulgate regulations establishing emissions standards for categories of major sources of hazardous air pollutants ("HAP").  The statute provides that a major source is a stationary source that emits or has the potential to emit more than 10 tons per year of any single hazardous air pollutant or more than 25 tons per year of any combination of hazardous air pollutants.  42 U.S.C. § 7412(a)(1).  Section 112(d) states that the emission standards must provide for the maximum degree of reduction in emissions, and cannot be less stringent than the emission control achieved in practice by the best controlled similar source, as determined by the Administrator.  42 U.S.C. §7412(d) (2), (3).

13.     Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), EPA promulgated certain standards applicable to specified manufacturing processes.  These standards are

often called MACT standards, for "maximum achievable control technology." EPA's MACT standards are generally set forth at 40 C.F.R. Part 63.

14.     Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), EPA has also promulgated national emission standards for hazardous air pollutants applicable to various sources based on use of a particular substance. These standards are commonly called NESHAPs and are set forth at 40 C.F.R. Part 61 and Part 63. Part 61 NESHAPs regulate only seven hazardous air pollutants: asbestos, beryllium, mercury, vinyl chloride, benzene, arsenic and radon.

15.     Section 112(i)(3) of the CAA provides that after the effective date of an emission standard, limitation or regulation promulgated under Section 112, no person may operate an existing source in violation of the standard, limitation or regulation after the compliance date set by the Administrator, which must provide for compliance as expeditiously as practicable, unless an extension is granted for one additional year by a State with an approved Title V permit program. 42 U.S.C. § 7412(i)(3).

<u>The Pharmaceutical MACT</u>

16.     EPA promulgated the Pharmaceutical MACT on September 21, 1998 pursuant to Section 112. The MACT is entitled Subpart GGG – "National Emission Standards for Hazardous Air Pollutants for Pharmaceuticals Production" and is set forth at 40 C.F.R. Part 63, subpart GGG. 40 C.F.R. § 63.1250 <u>et seq.</u> The compliance date for existing sources was October 21, 2002. The compliance date for new or reconstructed sources was August 29, 2000 or upon startup, whichever is later.

17.     The Pharmaceutical MACT applies to "affected sources" that (1) manufacture a "pharmaceutical product"; (2) are located at a plant site that is a major source as defined in Section

112(a) of the CAA; and (3) process, use, or produce a hazardous air pollutant.  40 C.F.R. § 63.1250(a).

18.     The Pharmaceutical MACT applies to general equipment, such as heat exchangers and waste management units; and to specific process equipment, such as storage tanks, processing equipment, and piping components. 40 C.F.R. § 63.1251.

19.     The Pharmaceutical MACT places emissions standards (or limits) on emissions of hazardous air pollutants from process vents, storage tanks, and wastewater streams. 40 C.F.R. §§ 63.1253, 63.1254, 63.1255, 63.1256.  To demonstrate compliance, the Pharmaceutical MACT sets forth mandatory test methods and compliance procedures.  40 C.F.R. § 63.1257.

20.     Affected sources must provide evidence of continued compliance with emission standards through specified monitoring requirements.  40 C.F.R. § 63.1258.

21.     The Pharmaceutical MACT also sets forth procedural requirements.  For example, an affected source must submit an initial notification.  40 C.F.R. § 63.1260(b).  Affected sources must also submit a Notification of Compliance Status report ("NOCSR"), and the information must be updated upon changes made to a process.  40 C.F.R. § 63.1260(f) and (h).

22.     The source must keep various records, such as of operating scenarios for its processes (40 C.F.R. § 63.1259(c)); leak detection monitoring records (40 C.F.R. § 63.1255(g)); vapor collection system and closed vent system inspection records (40 C.F.R. § 63.1259(i)(7)).

23.     An affected source must submit periodic reports, such as reports on each continuous monitoring system ("CMS") (40 C.F.R. § 63.1260(g)); and reports on process operation malfunctions (40 C.F.R. § 63.1260(i)(1)).

24.     An affected source must develop and implement various plans, such as a written startup, shutdown, and malfunction plan ("SSMP") (40 C.F.R. § 63.1259(a)(3)); a description of maintenance procedures for the management of wastewater (40 C.F.R. § 63.1256(a)(4)(i));  and a wastewater sampling plan (40 C.F.R. § 63.1257(b)(10)).

25.     An affected source must inspect annually vapor suppression equipment.  40 C.F.R. § 63.1258(h)(2).

26.     An affected source must perform testing for leaks of hazardous air pollutants from equipment such as pumps, compressors, agitators and connectors.  40 C.F.R. § 63.1255(a)(1). The monitoring includes requirements to follow specific methods, such as Method 21 of 40 C.F.R. Part 60, Appendix A. 40 C.F.R. § 63.1255(b)(4).

27.     An affected source must perform testing for leaks from heat exchangers.  40 C.F.R. § 63.1252(c).  An affected source must monitor each heat exchange system that cools process equipment according to the provisions of 40 C.F.R. § 63.104, which requires that the heat exchanger cooling water must be sampled for the presence of one or more organic hazardous air pollutants once per month for the first six months and then quarterly thereafter. 40 C.F.R. § 63.1252(c).

28.     The Pharmaceutical MACT includes wastewater standards set forth at 40 C.F.R. § 63.1256.  An affected source must determine whether the wastewater stream is an "affected wastewater stream" that requires control. 40 C.F.R. §§ 63.1256(a)(1), 63.1257(e)(1).

The Pesticide Active Ingredient Production  MACT

29.     EPA promulgated the Pesticide Active Ingredient Production ("PAI") MACT on June 23, 1999 pursuant to Section 112.  The MACT is entitled Subpart MMM – "National Emission Standards for Hazardous Air Pollutants for Pesticide Active Ingredient  Production" and

is set forth at 40 C.F.R. Part 63, Subpart MMM. 40 C.F.R. § 63.1360 et seq. The compliance date for existing sources was December 23, 2003.

30.     The PAI MACT applies to "affected sources," defined as the facility-wide collection of PAI manufacturing process units that process, use, or produce HAP, and are located at a plant site that is a major source, as defined in Section 112(a) of the CAA. 40 C.F.R. § 63.1360(a).

31.     A "PAI manufacturing process unit" is defined as "a process unit that is used to produce a material that is primarily used as a PAI or integral intermediate." "A material is primarily used as a PAI or integral intermediate if more than 50 percent of the projected annual production from a process unit in the 3 years after June 23, 1999 or startup, whichever is later, is used as a PAI or integral intermediate. . . ." 40 C.F.R. § 63.1361.

32.     "Pesticide active ingredient" means "any material that is an active ingredient within the meaning of FIFRA section 2(a); that is used to produce an insecticide, herbicide, or fungicide end use pesticide product; that consists of one or more organic compounds; and that must be labeled in accordance with 40 C.F.R. part 156 for transfer, sale, or distribution." 40 C.F.R. § 63.1361.

33.     "Integral intermediate" means "an intermediate for which 50 percent or more of the annual production is used in onsite production of any PAI(s) and that is not stored before being used in the production of another integral intermediate or the PAI(s)." 40 C.F.R. § 63.1361.

34.     The PAI MACT also applies to waste management units, heat exchange systems and cooling towers that are associated with PAI production. 40 C.F.R. § 63.1360(a).

35.    The PAI MACT places emissions standards (or limits) on emissions of hazardous air pollutants from process vents, storage vessels, wastewater streams, product dryers and bag dumps.  40 C.F.R. §§ 63.1362.  To demonstrate compliance, the PAI MACT sets forth mandatory test methods and compliance procedures.  40 C.F.R. § 63.1365.

36.    Affected sources must provide evidence of continued compliance with emission standards through specified monitoring requirements.  40 C.F.R. § 63.1366.

37.    The PAI MACT sets forth various reporting requirements.  For example, an affected source must submit an Initial Notification, a NOCSR, Periodic reports, and the information must be updated upon changes made to a process.  40 C.F.R. § 63.1368.

38.    An affected source must develop and implement various plans, such as a written startup, shutdown, and malfunction plan ("SSMP") (40 C.F.R. § 63.1367(a)(3)); and a wastewater sampling plan (40 C.F.R. § 63.1362(d)).

39.    An affected source must inspect annually vapor suppression equipment (40 C.F.R. § 63.1366(h)(2)) and must keep vapor collection system and closed vent system inspection records (40 C.F.R. § 63.1367(f)(4), (6)).

40.    An affected source must perform testing for leaks of hazardous air pollutants from equipment such as pumps, compressors, agitators, and connectors.  40 C.F.R. § 63.1263(a)(1). The monitoring includes requirements to follow specific methods, such as Method 21 of 40 C.F.R. Part 60, Appendix A.  40 C.F.R. § 63.1255(b)(3).

41.    An affected source must monitor each heat exchange system that cools process equipment according to the provisions of 40 C.F.R. § 63.104, which requires that the heat exchanger cooling water must be sampled for the presence of one or more organic hazardous air

9

pollutants once per month for the first six months and then quarterly thereafter. 40 C.F.R. § 63.1362(f).

42.    The PAI MACT includes wastewater standards set forth at 40 C.F.R. § 63.1362(d), which incorporates other provisions specifying which waste streams must be identified and analyzed for HAP concentrations.

<u>The Miscellaneous Organic Chemical Manufacturing MACT</u>

43.    EPA promulgated the Miscellaneous Organic Chemical Manufacturing MACT (or "MON") on November 2, 2003 pursuant to Section 112.  The MON is entitled Subpart FFFF – "National Emission Standards for Hazardous Air Pollutants: Miscellaneous Organic Chemical Manufacturing " and is set forth at 40 C.F.R.  Part 63, subpart FFFF.  40 C.F.R. § 63.2430 <u>et seq.</u>  The compliance date for existing sources was May 10, 2008.

44.    The MON applies to owners or operators of miscellaneous organic chemical manufacturing process units ("MCPUs") that are located at, or are or part of, a major source of hazardous air pollutants.  40 C.F.R. § 63.2435.

45.    A MCPU includes equipment necessary to operate a miscellaneous organic chemical manufacturing process that satisfies the following conditions: 1) the MCPU produces material or family of materials that is an organic chemical classified using the 1987 version of SIC code 283; 2) the MCPU processes, uses or generates a hazardous air pollutant; and 3) the MCPU is not an affected source or part of an affected source under another subpart of this Part 63.  40 C.F.R. § 63.2435(b).

46.    A "miscellaneous organic chemical manufacturing process" is all equipment which collectively function to produce a product or isolated intermediate that are materials described

10

in 40 C.F.R. § 63.2435(b). For the purposes of the MON, "process" includes any, all or a combination of reaction, recovery, separation, purification, or other activity, operation, manufacture, or treatment which are used to produce a product or isolated intermediate. 40 C.F.R. § 63.2550.

47. The MON places emission standards (or limits) on emissions of hazardous air pollutants from process vents, storage tanks, and wastewater streams. 40 C.F.R. §§ 63.2455, 63.2460, 63.2470.

48. An affected source must perform testing for leaks of hazardous air pollutants from equipment such as pumps, compressors, agitators, and connectors. 40 C.F.R. § 63.2480. The monitoring includes requirements to follow specific methods, such as Method 21 of 40 C.F.R. Part 60, Appendix A. 40 C.F.R. § 63.2480(b).

49. The MON also sets forth procedural requirements. For example, an owner or operator of a MCPU must submit a NOCSR, and the information must be updated upon changes made to a process. 40 C.F.R. §§ 63.2520 and 2525. Thereafter, an owner or operator must submit compliance reports, such as reports on each continuous monitoring system and on leak detection and repair ("LDAR"). 40 C.F.R. § 63.2520.

50. Facilities subject to the MON were required to submit a NOCSR by October 7, 2008 (within 150 days of the MON compliance date of May 10, 2008.) 40 C.F.R. § 63.2520(d).

Benzene Equipment Leak NESHAP

51. The Benzene Equipment Leak NESHAP is codified at 40 C.F.R. Part 61, Subpart J and contains standards for equipment in benzene service. The effective date of this NESHAP was November 1, 1985.

52.    The NESHAP applies to pumps, compressors, pressure relief devices, sampling connection systems, open-ended valves or lines, valves, connectors, surge control vessels, bottoms receivers, and control devices or systems in benzene service.  40 C.F.R. § 61.110.

53.    "In benzene service" means that "a piece of equipment either contains or contacts a fluid (Liquid or gas) that is at least 10 percent benzene by weight."  40 C.F.R. § 61.111.

54.    Owners and operators of equipment subject to Subpart J are also subject to the requirements of Subpart V (National Emission Standard for Equipment Leaks (Fugitive Emission Sources) (40 C.F.R. § 61.112(a)), relating to detection of leaks from equipment and to associated recordkeeping.

<u>Benzene Waste Operations NESHAP</u>

55.    The Benzene Waste NESHAP is codified at 40 C.F.R. Part 61, Subpart FF and contains standards for benzene waste operations.  The effective date of this NESHAP was January 7, 1993.

56.    The NESHAP applies to, <u>inter alia</u>, owners and operators of chemical manufacturing plants.  40 C.F.R. § 61.340.

57.    "Chemical Manufacturing Plant" means "any facility engaged in the production of chemicals by chemical, thermal, physical, or biological processes for use as a product, co-product, by-product, or intermediate including but not limited to industrial organic chemicals. . . ."  40 C.F.R. § 61.341.

58.    The NESHAP requires the owner or operator to submit a report that summarizes the regulatory status of each waste stream subject to § 61.342.  The report must contain the total annual benzene quantity from facility waste.   40 C.F.R. § 61.357(a).

12

### Title V Permits

59.     Title V of the CAA, entitled "Permits," 42 U.S.C. § 7661-7661e, established an operating permitting program designed to include all applicable requirements of the CAA and a State Implementation Plan into a single permit, and to provide for permitting for sources of hazardous air pollutants.  Section 502 of the CAA required States to submit an approvable Title V permitting program before November 15, 1993, and allowed EPA to approve on an interim basis programs that substantially meet the requirements of Title V.  42 U.S.C. § 7661a(g).  Pursuant to Section 502, the Administrator has promulgated regulations at 40 C.F.R. Part 70 setting forth the minimum requirements for an approvable Title V program.  57 Fed. Reg. 32250, 32295 (July 21, 1992).

60.     EPA approved South Carolina's Title V program on June 26, 1995, with an effective date of July 26, 1995.  60 Fed. Reg. 32913, 32916 (June 26, 1995).

61.     Major sources are subject to permitting under South Carolina's Title V program.  S.C. Admin. Code § 61-62.70.3.  A "major source" includes any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit, in the aggregate, 10 tons per year (tpy) or more of any hazardous air pollutant which has been listed pursuant to Section 112(b) of the CAA, 25 tpy or more of any combination of such hazardous air pollutants, or such lesser quantity as the EPA Administrator may establish by rule.  S.C. Admin. Code § 61-62.70.2(r).  Under South Carolina's air regulations, a "stationary source" is any building, structure, facility, or installation that emits or may emit any "regulated air pollutant" or any pollutant listed under Section 112(b) of the CAA.  S.C. Admin. Code § 61-62.70.2(gg).  A "regulated air pollutant" includes any volatile organic compound, any pollutant

13

that is subject to any standard promulgated under Section 111 of the CAA and any pollutant subject to a standard promulgated under Section 112 or other requirements established under Section 112 of the CAA.  S.C. Admin. Code § 61-62.70.2(aa).

62.     Section 113(b)(2) of the CAA, 42 U.S.C. § 7413(b)(2), authorizes the Administrator, acting through the Attorney General, to initiate a judicial enforcement action for a permanent or temporary injunction, and/or for a civil penalty of up to $25,000 per day of violation, against any person whenever such person has violated, or is in violation of, requirements of the CAA other than those specified in Section 113(b)(1) (involving state implementation plans and state issued permits), 42 U.S.C. § 7413(b)(1).

63.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, the maximum statutory penalty for violations occurring after January 30, 1997 increased to $27,500 per day for each violation, increased to $32,500 per day for each violation occurring after March 15, 2004, and increased to $37,500 per day for each violation occurring after January 12, 2009.

**RCRA**

64.     The Resource Conservation and Recovery Act (RCRA), enacted in 1976, amended the Solid Waste Disposal Act of 1965.  Subtitle C of RCRA, 42 U.S.C. §§ 6901-6939b, authorized the "cradle-to-grave" regulation of hazardous waste.  RCRA was amended in 1984 by the Hazardous Waste and Solid Waste Amendments (HSWA), Pub. L. 98-616, which added additional requirements.

65.     RCRA Section 3006, 42 U.S.C. § 6926, provides that a state may obtain federal authorization to administer the RCRA hazardous waste program in that state.  Pursuant to

Section 3006(b) and (g) of RCRA, 42 U.S.C. § 6926(b) and (g), on November 22, 1985, the State

of South Carolina received final authorization to administer certain portions of the State hazardous

waste program in lieu of the federal program set forth in RCRA.  The provisions of the South

Carolina hazardous waste management program, found at South Carolina Hazardous Waste

Management Act 44-56-10 et seq. and at South Carolina Hazardous Waste Management Regulations

at R.61-79.260 through 279,  have become requirements of Subchapter III of RCRA and are thus

enforceable by the United States, pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), upon

notification to the State of South Carolina.

      66.    Subchapter III of RCRA, 42 U.S.C. §§6921-6939b and the S.C Code Ann.

§44-56-30 et seq., and the regulations promulgated thereunder, establish requirements applicable

to owners and operators of facilities that manage hazardous waste.

      67.    S.C. Code Ann. § 44-56-60(a)(2) prohibits the operation of any hazardous

waste treatment, storage or disposal facility except in accordance with a RCRA permit, unless the

facility has interim status under S.C. Code Ann. § 44-56-60(b).

      68.    S.C. Code Ann. § 44-56-60(b) and S.C. Code Ann. Regs.  R. 61-79.270.1

provide that an owner or operator of a facility that is required to have a permit may obtain so-called

"interim status" and be treated as if a permit had been issued pending the final disposition of the

permit application provided that the person:

      (A) owns or operates a facility required to have a permit under this section which

is in existence on the effective date of the statutory requirement to have a permit under this section,

      (B) has complied with the requirements of S.C. Code Ann. § 44-56-120,  and

      (C) has made an application for a permit under this section.

69.     Under S.C. Code Ann. Regs. R. 61-79.262.34(a), a generator of hazardous waste may accumulate hazardous waste onsite for up to 90 days without a permit or interim status provided that certain conditions are met.  These conditions include: the use and management of containers, addressed in part 265, subpart I,  the use and management of tanks, addressed in part 265, subpart J, preparedness and prevention and contingency plan and emergency procedures, addressed in part 265, subparts C and D.

70.     S.C. Code Ann. Regs. R. 61-79.262.11 requires that any person who generates a solid waste determine if that waste is a hazardous waste.

71.     S.C. Code Ann. Regs. R.  61-79.265.196 requires that a tank system or secondary containment system from which there has been a leak or spill, or which is unfit for use, must be removed from service immediately.

72.     S.C. Code Ann. Regs. R. 61-79.273 requires proper handling of universal waste lamps.

73.     S.C. Code Ann. Regs. R.  61-79.262 requires proper transportation, manifesting, packaging and labeling of hazardous waste.

74.     Regulations promulgated under RCRA define "storage" as "the holding of hazardous waste for a temporary period, at the end of which the hazardous waste is treated, disposed of, or stored elsewhere."  S.C. Code Ann. Regs. R. 61-79.260.10.

75.     Regulations promulgated under RCRA define "solid waste" as "any discarded material" that is not otherwise excluded under regulations.  S.C. Code Ann. Regs. R. 61-79.261.2. A "discarded material" is, inter alia,  any material which is disposed of, accumulated, stored before or in lieu of being disposed of, burned, or incinerated.  Id.

16

76.     Regulations promulgated under RCRA define "disposal" to include the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air, or discharged into any waters, including groundwaters.  S.C. Code Ann. Regs. R. 61-79.260.10.

77.     "Facility" means all contiguous land, and structures, other appurtenances, and improvements on land, used for treating, storing, or disposing of hazardous waste.  S.C. Code Ann. Regs. R. 61-79.260.10.

78.     Section 3008(a)(1) of RCRA, 42 U.S.C. §6928(a)(1), authorizes the commencement of a civil action by EPA for appropriate relief, including a temporary or permanent injunction, when any person has violated or is in violation of any requirement of Subchapter III of RCRA, including provisions of a federally approved state hazardous waste management program.

79.     Section 3008(g) of RCRA, 42 U.S.C. §6928(g) provides that any person who violates any requirements of Subchapter III of RCRA shall be liable to the United States for a civil penalty of up to $25,000 per day for each violation.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, the maximum statutory penalty for violations occurring after January 30, 1997 increased to $27,500 per day for each violation, increased to $32,500 per day for each violation occurring after March 15, 2004, and increased to $37,500 per day for each violation occurring after January 12, 2009.

**CWA**

80.     The objective of the CWA is to restore and maintain the chemical, physical and biological integrity of the Nation's waters.  33 U.S.C. § 1251(a).

81.     Section 301 of the CWA, 33 U.S.C. § 1311, prohibits the discharge of a pollutant by any person, except as authorized by and in compliance with certain enumerated sections of the CWA, including CWA Section 402, 33 U.S.C. § 1342.

82.     Section 502 of the CWA, 33 U.S.C. § 1362(12), defines the term "discharge of a pollutant" as: "[A]ny addition of any pollutant to navigable waters from any point source . . . ."

83.     Section 502 of the CWA, 33 U.S.C. § 1362(6), defines the term "pollutant" to include chemical, industrial, municipal, and agricultural waste.

84.     Section 502 of the CWA, 33 U.S.C. § 1362(7), defines the term "navigable waters" as the waters of the United States, including its territorial seas.

85.     Section 502 of the CWA, 33 U.S.C. § 1362(14), defines the term "point source" as any discernible, confined and discrete conveyance, including, but not limited to, any ditch, channel, tunnel, conduit, well, or discrete fissure from which pollutants may be discharged.

86.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the U.S. EPA Administrator ("Administrator") may issue a permit, known as the National Pollutant Discharge Elimination System ("NPDES") permit, that authorizes the discharge of a pollutant, upon the condition that such discharge meet the requirements of the CWA or other conditions that the Administrator may find are necessary.  Typically such permits include effluent limitations, monitoring and reporting requirements, as well as operating and maintenance requirements.

87.    The Administrator may approve a State NPDES permitting and enforcement program if the State so requests and if the Administrator determines that the State complies with certain requirements.  Section 402(b) of the CWA, 33 U.S.C. § 1342(b).

88.    If the Administrator approves a state permitting and enforcement program pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b), the Administrator retains the authority to take enforcement action under Section 309 of the CWA, 33 U.S.C. § 1319 and Section 402(i) of the CWA, 33 U.S.C. § 1342(i).

89.    On June 10, 1975, the State of South Carolina received authority for its NPDES permitting program.  The South Carolina Department of Environmental Conservation ("DHEC") is the primary enforcement authority in the State.

90.    Section 309 of the CWA, 33 U.S.C. § 1319 authorizes the Administrator to commence a civil action for injunctive relief and civil penalties of up to $25,000 per day of violation, whenever any person is in violation of Section 301 of the CWA, 33 U.S.C. § 1311, or has violated any permit condition or limitation in a permit issued under Section 402 of the CWA, 33 U.S.C. § 1342.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, the maximum statutory penalty for violations occurring after January 30, 1997 increased to $27,500 per day for each violation, increased to $32,500 per day for each violation occurring after March 15, 2004, and increased to $37,500 per day for each violation occurring after January 12, 2009.

## GENERAL ALLEGATIONS

91.    The WeylChem Elgin facility has the potential to emit more than 10 tons of a single HAP and 25 tons per year of total HAPs combined.

19

92.     WeylChem's Elgin facility processes, uses and/or produces HAPs.

93.     WeylChem operates a specialty batch chemical processing facility that produces multi-purpose chemicals, including pharmaceutical intermediates, pesticide active ingredients, and agricultural intermediates, among other things. One production run of a chemical is called a batch and results in the production of a finite quantity of the chemical being produced.

94.     WeylChem's Elgin facility contains equipment in benzene service, as defined in 40 C.F.R. § 61.111.

95.     Weylchem has manufactured pharmaceuticals at Plant 5 of the Elgin facility since it was reconstructed in March 2001. Weylchem became subject to the new source provisions of the Pharmaceutical MACT on this date.

96.     Weylchem has manufactured pharmaceuticals at Plants 1, 3, and 4 of the Elgin facility since the Pharmaceutical MACT compliance date of October 21, 2002.

97.     Weylchem has manufactured pesticide intermediates since the PAI MACT compliance date of December 23, 2003.

98.     Weylchem has manufactured miscellaneous organic chemicals since the MON compliance date of May 10, 2008.

99.     At WeylChem's facility there are 122 heat exchangers subject to the requirements of 40 C.F.R. § 63.1252(c) and 63.1362(f).

100.    Effective April 1, 2003, the DHEC's Bureau of Air Quality issued a Title V permit to WeylChem as a major source of hazardous air pollutants. The Title V permit, number TV-1380-0-017, expired on March 31, 2006, but WeylChem applied for a renewal on September 30, 2005.

20

101.    WeylChem's Title V permit states on page 19: "Any equipment/processes in Emission Units 01-03 used to produce a Pharmaceutical product or by-product, as defined in 40 C.F.R. 63.1251, that uses, processes, or produces hazardous air pollutants (HAP) will be subject to all applicable requirements of 40 C.F.R. 63, Subpart A - General Provisions, as well as 40 C.F.R. 63, Subpart GGG - National Emission Standards For Pharmaceuticals Production beginning October 21, 2002.  Any equipment/processes in Emission Unit 04 used to produce a Pharmaceutical that uses, processes or produces HAP is currently subject to 40 C.F.R. Subparts A and GGG."

102.    WeylChem's Title V permit states on page 19: "Any equipment/processes in Emission Units 01-04 used to produce a Pesticide Active Ingredient, as defined in 40 C.F.R. 63.1361, that uses, processes, or produces HAP will be subject to all applicable requirements of 40 C.F.R. 63, Subpart A-General Provisions, as well as 40 C.F.R. 63, Subpart MMM - National Emission Standards For Pesticide Active Ingredients beginning December 23, 2003."

103.    WeylChem's Title V permit states on page 107: " All equipment that are used in the service of storing, handling or treating wastewater containing benzene are subject to the appropriate provisions of  40 C.F.R. Part 61 Subparts A and FF."

104.    WeylChem's Title V permit states on page 127: "Any Equipment in Emission Units 01 through 04 with equipment intended to operate in Benzene service as specified in 40 C.F.R. 61, Subpart J, under conditions that subject it to the requirements of that subpart, shall implement a LDAR program in accordance with 40 C.F.R. 61, Subpart V - National Emission Standard For Equipment Leaks (Fugitive Emission Sources)."

105.    Defendant held an NPDES permit with an effective date of June 1, 2003

(Permit No. SC0002682), issued by DHEC.  The permit was scheduled to expire on July 31, 2005, but was administratively continued until November 1, 2009.  Defendant received a new NPDES permit (also No. SC0002682) on October 1, 2009, with an effective date of November 1, 2009.

106.    The permit allows discharge of pollutants to the Wateree River through Outfall 001, which discharges "into the Wateree River to the deep channel on the far side of the river from the treatment plant, where the treated wastewater exits through a 14-port diffuser."  The permit specifies effluent limitations, monitoring and reporting requirements, and operation and maintenance provisions, among other conditions.

107.    The facility discharges through a submerged multi-port diffuser to the Wateree River.  The diffuser is perpendicular to the flow of the river and is 26 meters long.

108.    Part II.E. of the permit requires that the defendant "at all times properly operate and maintain in good working order and operate as efficiently as possible all facilities of treatment and control (and related appurtenances) which are installed or used by the permittee to achieve compliance with the terms and conditions" of the permit.

109.    Part II.L of the permit requires notification to DHEC of any non-compliance which may endanger health or the environment within 24 hours of becoming aware of the circumstances.  Any other non-compliance shall be noted on the Discharge Monitoring Reports ("DMRs").

110.    Under the terms of Part IV of the 2003 NPDES permit, Defendant was required to cease its discharge by July 30, 2005 by hooking up to a regional sewerage system, Palmetto Utilities.  To date, this hookup has not occurred.

111.    Under Consent Order 006-195-W, DHEC allowed the Defendant to continue to operate its wastewater treatment plant but required that the water be pre-treated in a pretreatment plant it operates.  The Order provides that defendant eliminate all discharge to the Wateree River within 120 days from receipt of a pretreatment permit from Palmetto Utilities.

112.    The Wateree River is a "navigable water" of the United States.  It is a tributary of the Santee River which flows into the Atlantic Ocean.  At the point of Defendant's discharge, the stream is 103 meters wide. The United States Army Corps of Engineers has classified the Wateree River as a "navigable water of the United States" under Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, between its mouth at the confluence with the Congaree River to its headwaters at Wateree Dam.  The Defendant's outfall of discharge to the Wateree River falls between the confluence with the Congaree River and the Wateree Dam.

113.    Defendant admits that its Elgin facility has been a large quantity generator of hazardous waste during the times relevant to this Complaint.

114.    The Elgin facility generates wastewater in its chemical manufacturing process.  Some of this wastewater is eventually sent to the Wateree facility for treatment and discharge.  It is Defendant's practice to ship each load of wastewater transported from Elgin to Wateree as non-hazardous.

115.    At various times from 1980 to 1990, Defendant started the process to obtain a permit under RCRA for the Wateree facility to be permitted as a hazardous waste treatment, storage or disposal ("TSD") facility.

116.    In September, 1993, EPA determined that the Wateree facility lost its interim status as a TSD because it failed to meet RCRA's financial assurance requirements.

23

117.    Also in September 1993, EPA issued an administrative Order to the defendant that penalized Defendant for operation of surface impoundment #1 without a permit or interim status.  The Order mandated that Defendant stop placing hazardous waste into surface impoundment # 1 until it is permitted, certify on a quarterly basis that hazardous waste is not placed in it, and submit a plan for closure.

118.    Closure of surface impoundment #1 was completed in 1998 and approved by EPA in March 1999.

119.    On September 27, 2000, EPA issued an Administrative Order under Section 3013 of RCRA, 42 U.S.C. § 6934, that required investigation of various solid waste management units ("SWMUs") and other areas of concern at the Wateree facility.  In this Order, EPA determined that there may be a substantial hazard to human health or the environment due to the presence of hazardous wastes and constituents and potential releases of hazardous wastes.

120.    From late 1997 or thereabouts, Weylchem began operation of an air stripper at the Elgin facility (C-26) that, among other things, reduced the levels of VOCs in its wastewater.

121.    Sometime after the installation of the air stripper, but no later than 1999, Defendant ceased reporting to DHEC that it was generating hazardous wastewater at Elgin or receiving hazardous wastewater at Wateree.  Defendant reported no wastewater sent from Elgin or received at Wateree for the years 2000-2005.

122.    Sometime in 1997-99, Defendant ceased to ship its wastewater to Wateree with a hazardous waste manifest, but instead shipped it as nonhazardous.  Prior to this time, Defendant had shipped its wastewater from Elgin to Wateree with a hazardous waste manifest that

identified the wastewater as hazardous for benzene (EPA Hazardous Waste Code No. D018), a VOC.

123.    The air stripper was not functioning from about June 13, 2004 to about January 26, 2006.  During most, if not all, of this time, Defendant continued to ship the waste under a nonhazardous bill of lading.

124.    Defendant has not submitted to EPA sampling results/analyses for all or most of its wastewater shipped from Elgin to Wateree from the time that the air stripper was not functioning despite a specific request from EPA for such information on February 21, 2007.  Therefore, subject to a reasonable opportunity for further investigation and discovery, Defendant did not sample its waste to determine if it was hazardous prior to shipping it to Wateree.

125.    On September 14, 2005, EPA conducted a RCRA inspection of the Elgin and Wateree facilities and noted thirty-one (31) RCRA violations including, but not limited to: failure to properly inspect containers of hazardous waste; failure to maintain adequate records of inspections of the less-than-90-day hazardous waste container area; inappropriate secondary containment for tank systems (e.g., bare concrete that was not impervious and lack of secondary containment for ancillary equipment); failure to maintain adequate secondary containment in less-than-90-day hazardous waste container area by having an uncoated concrete pad and cracks in the containment wall; lack of appropriate spill prevention systems; failure to close hazardous waste tanks properly in the less-than-90-day hazardous waste container storage area; failure to maintain the facility to minimize the possibility of fire, explosion, or release of hazardous substances; failure to clean up hazardous waste discharges; failure to make a proper hazardous waste determination for

a liquid spilling out of a hose near tank TSS-229; failure to label each container with the accumulation start date and hazardous waste number in the less-than-90-day hazardous waste container storage area; failure to take tanks TSS-229 and TS-27 out of service when waste material was discovered in the secondary containment area; failure to use appropriate controls or practices to prevent overflows and failure to operate in a manner likely to minimize the potential impact of any release of hazardous waste and failure to clean up a hazardous waste discharge from tank TSS-229, as evidenced by the pool of liquid in the containment area, the stained areas outside the secondary containment and the brownish purple liquid flowing into a trench, and from tank TS-27, as evidenced by stains on the outside of the tank and accumulation of liquid in the secondary containment; failure to have two employees receive their required annual refresher training; failure to properly store, label or date used universal waste lamps .  An inspection report was sent to defendant outlining the details of these violations on May 5, 2006.

126.    According to internal company documents, Defendant received complaints regarding odors emanating from the Wateree facility during 2005 and 2006.  DHEC officials also received complaints about odors during this time period.

127.    In late January and February 2006, Defendant gave notice to DHEC that it had exceeded its NPDES permit limits for several pollutants, including benzene; 1, 3-dichlorobenzene; ethylbenzene, methylene chloride; toluene; 1,4-dichlorobenzene; dimethylephenol; and phenol, and stated that the reason for the exceedences was that the air stripper was inoperable.

128.    The reported level of benzene in the sampled wastewater was 1.3 parts per million (ppm) while the defendant's NPDES permit limit for benzene is 0.136 ppm.

129.    Based on the levels of pollutants found in the effluent at the point of discharge to the Wateree River, it is evident that the wastewater was hazardous at all prior points upstream of the discharge point, including the surface impoundments at Wateree.

130.    Defendant was not permitted to accept hazardous waste for treatment, storage or disposal in the surface impoundments at Wateree.

131.    Once hazardous waste was placed in the surface impoundments at Wateree, defendant was subject to TSD permitting under S.C. Code Ann. § 44-56-60(b) and S.C. Code Ann. Regs. R. 61-79, and the standards for TSD facilities under S.C. Code Ann. Regs. R. 61-79.264, including the actions specified for surface impoundments under S.C. Code Ann. Regs. R. 61-79.264, subpart K.  Defendant did not have a TSD permit and failed to undertake most or all of the actions required of TSDs.

132.    Upon becoming subject to TSD permitting, it was no longer legal for defendant to ship waste to Wateree, since it was not a permitted hazardous waste treatment, storage or disposal facility.

133.    The placement of benzene at levels constituting hazardous waste in surface impoundment No. 1 effectively negated the clean closure approved by EPA in 1999.

134.    On February 13, 2006 and April 28, 2006, defendant submitted letters to EPA self-disclosing a number of RCRA violations related to the shipment of wastewater from Elgin to Wateree from December 15, 2005 to January 24, 2006.  The disclosed violations included: failure to conduct a hazard determination before shipment; failure to properly manifest the waste; failure to package the waste appropriately; and failure to placard the waste.

135.    On January 30 and 31, 2006, DHEC officials inspected the Wateree Site and met with officials from defendant following the report of various exceedences of the company's NPDES permit, discussed above.  On that day, the pumps at the influent pump station were not operational, the air stripper was broken, and the equalization tank was out of service. Perry Collins, the Manager of Health, Safety and Regulatory Affairs for the defendant, informed the DHEC personnel that the equipment at the Wateree site was well past preventive maintenance stage and that defendant was attempting to keep the plant operating with minimal expenditures for maintenance pending tie in to Palmetto Utilities.

136.    On February 14-16, 2006, EPA and DHEC inspectors conducted a Compliance Sampling Inspection at the Wateree facility.  Several significant deficiencies were noted, as set forth in an Inspection Report mailed to the defendant on September 6, 2006. Specifically, the EPA inspectors noted that the October 2005 DMR contained transcription errors, the facility did not retain calibration records, flow meters were not properly calibrated, samples were kept at an incorrect temperature, composite samples were taken at regular intervals, and the pH meter was not properly calibrated.

137.    On February 15, 2006, during the inspection, DHEC inspectors were present at the Wateree site when one of the trucks carrying defendant's wastewater was unloading.  The inspectors observed the sump overflowing and raw wastewater flowing down to a ditch and down a hill to a wetland located between the load-off facility and the wastewater treatment plant. Defendant hired a company to vacuum up the spilled liquid but undertook no soil remediation. Defendant's employee Perry Collins indicated to DHEC's inspectors that since the Wateree facility

was to be closed upon connection with Palmetto Utilities and the whole site would then need to be cleaned up, no soil clean up would be conducted until that time.

138.    Prior to 2008, defendant claimed to rely on generator knowledge to make hazardous waste determinations but did not maintain records of every point of generation for waste streams placed into the wastewater management system and therefore did not make hazardous waste determinations for some or most wastewaters generated at the Elgin facility.

139.    Defendant's sampling for benzene for the following dates: February 13, 17, 20, 23, and 27;  March 2, 6, 9, 16, 20, 23, and 27; April 3, 17, and 24 and May 1, and 8, 2006 employed a test method that was not sensitive enough to determine if the waste was hazardous.  On information and belief, defendant did not sample from May 24, 2006 to August 14, 2006 and thus conducted no hazardous waste determinations prior to shipment to the Wateree facility during this time.

140.    On July 3, 2006, defendant requested from DHEC a 30-day extension of the 90 days it is allowed to store waste at the Elgin facility without a permit or interim status for waste stored in TSS-229 and six frac tanks.  On July 14, 2006, DHEC denied the request finding that defendant "failed to take the necessary steps to ensure that hazardous waste generated at the facility was not stored onsite for greater than 90 days."  Defendant stored the waste for 28 days more than was permissible.

141.    Defendant submitted copies of weekly inspection logs to EPA on August 27, 2007 and admitted that eleven log sheets from June 1, 2006 to February 21, 2007 were missing.

142.    EPA conducted a further RCRA inspection on September 30, 2008.  A number of violations were observed. Specifically, EPA observed the storage of hazardous waste at

the Elgin facility in tanks DS-27, S-26, SR-17, S-27 and SR-11 without a permit or interim status; the treatment of hazardous waste in those tanks as well as in ET-1, T-2000, the degasser tank, the air stripper, and the clarifier; the storage of hazardous waste in all the tanks that are part of the Elgin water treatment tank system; storage of hazardous waste in tanks that were not properly closed; failure to designate tanks as hazardous waste tanks, certify them, have adequate secondary containment, and undertake proper inspections; failure to maintain adequate secondary containment for less-than-90 day storage area due to a large gap and cracks in the containment walls and chips in the coating; and failure to maintain adequate secondary containment for tank systems.

143.    On March 25, 2009, EPA conducted an NPDES inspection at the Wateree facility and the Elgin facility.  EPA noted several deficiencies, including: the pretreatment clarifier scum sweep arm broke off and had been out of service since July 28, 2008; the Wateree facility had no standby power; the pretreatment stripper pump was not working; one aeration basin had a broken aerator; and clarifiers had excessive sludge in them.

144.    On April 16, 2009, DHEC inspectors observed an unauthorized effluent discharge at the Wateree plant.  Instead of discharging through the authorized outfall into the Wateree River, the plant was discharging effluent from a four-inch diameter vertical pipe onto the river bank.  DHEC's inspectors concluded that the illegal discharge had been going on for quite some time, as indicated by ground erosion and the ditch caused by the effluent.

145.    On May 21, 2009, DHEC inspectors returned to the Site and found that the effluent was discharging from a different illegal location and was bubbling up through mud and sand in two areas.  As of June 10, 2009, Defendant admitted the illegal discharge had not  ceased and

DHEC had not been formally notified.  As of the date of this Complaint, the illegal discharge has not ceased.

146.    During the time period April 2002 to the present, Defendant has submitted DMRs to DHEC as required under its permit.

147.    The DMRs demonstrate that defendant discharged pollutants, including: total phenols; benzene; toluene; ethylbenzene; 1,3 dichlorobenzene; methylene chloride; 1, 4 dichlorobenze; 2,4 dimethylphenol; 1, 2 dichlobenzene; phenol; and 4-nitrophenol from its Wateree facility through Outfall 001 which is a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14), in excess of the permitted effluent limitations at various times from April 2002 to the present.

<u>CLAIMS FOR RELIEF 1-42</u>
(CAA - Pharmaceutical MACT)

148.    Plaintiff realleges and incorporates by reference paragraphs 1 through 147 as if fully set forth herein.

149.    WeylChem failed to submit a complete Initial Notification required by 40 C.F.R. § 63.1260(b) to EPA, as detailed in Violations 26 and 27 in Appendix A.

150.    WeylChem failed to submit a complete NOCSR as required by 40 C.F.R. § 63.1260(f), as detailed in Violation 28 in Appendix A.

151.    WeylChem failed to keep appropriate records of operating scenarios for each process, as required by 40 C.F.R § 63.1259(c), as detailed in Violation 29 in Appendix A.

152.    WeylChem failed to submit complete Periodic reports and failed to submit the reports on schedule, as required by 40 C.F.R. § 63.1260(g), as detailed in Violations 30 and 31 in Appendix A.

153. WeylChem failed to have startup, shutdown and malfunction plans (SSMPs) at the times and for the processes required by 40 C.F.R. § 63.1259(a)(3), as detailed in Violations 1, 2, 32 and 33 in Appendix A. Moreover, WeylChem failed to revise the plans as required, as detailed in Violation 3 in Appendix A.

154. WeylChem did not submit and maintain appropriate startup, shutdown and malfunction (SSM) event reports, as required by 40 C.F.R. § 63.1260(i)(1) and (2), as detailed in Violations 4 and 34 in Appendix A.

155. WeylChem failed to keep records of its inspections of vapor collection systems, closed vent systems, fixed roof, cover, and enclosures, as required by 40 C.F.R. § 63.1259(i)(7) and (9), as detailed in Violation 5 in Appendix A.

156. WeylChem did not demonstrate compliance with emission limits for process vents through performance testing under worst case conditions, as required by 40 C.F.R. § 63.1254(a), 63.1257(d)(3)(ii)(B), as detailed in Violations 6 and 7 in Appendix A.

157. WeylChem did not perform an initial compliance test on its process condensors, as required by 40 C.F.R. §§ 63.1254(a), 63.1257(d)(3)(iii)(B), as detailed in Violations 8, 9, and 10 in Appendix A.

158. WeylChem violated 40 C.F.R. § 63.1254(a) and (b) by its failure to demonstrate continuing compliance with the process vent standards for process vent emissions, as detailed in Violations 11 and 12 in Appendix A.

159. WeylChem did not comply with the planned routine maintenance provisions of the process vent standards and thereby violated 40 C.F.R. § 63.1254(a)(4), as detailed in Violations 35, 36, and 37 in Appendix A.

160.     WeylChem violated the storage tank standards in 40 C.F.R. § 63.1253(b), (c), (e) as detailed in Violations 13, 14, 16, and 17 in Appendix A.

161.     WeylChem violated the storage tank standards planned routine maintenance requirement of 40 C.F.R. § 63.1253(e), as detailed in Violation 15 in Appendix A.

162.     WeylChem violated the equipment leak standards of 40 C.F.R. § 63.1255(a), as detailed in Violations 18 and 20 in Appendix A.

163.     WeylChem did not adhere to Method 21 when conducting LDAR monitoring, as required by 40 C.F.R. § 63.1255, as detailed in Violation 19 in Appendix A.

164.     WeylChem violated 40 C.F.R. § 63.1255(d)(1)(i) by its failure to equip each open-ended valve or line with a cap, blind flange, plug or second valve, as detailed in Violation 21 in Appendix A.

165.     WeylChem violated 40 C.F.R. § 63.1255(b)(3) by its failure to properly equip its sampling connection systems, as detailed in Violation 22 in Appendix A.

166.     WeylChem violated the monitoring requirements for control devices, as set forth in 40 C.F.R. § 63.1258(b)(8), as detailed in Violation 23 in Appendix A.

167.     WeylChem violated 40 C.F.R. § 63.1258(b)(1) by its failure to calibrate its monitoring devices on an annual basis, as detailed in Violation 25 in Appendix A.

168.     WeylChem failed to use an approved wastewater sampling method, violating 40 C.F.R. § 63.1257(e)(1)(ii)(A), as detailed in Violation 38 in Appendix A.

169.     WeylChem failed to develop a complete wastewater sampling plan as required by 40 C.F.R. § 63.1257(b)(10), as detailed in Violation 39 in Appendix A.

170.    WeylChem violated the wastewater standards by its failure to appropriately test wastewater from its processes as required by 40 C.F.R. § 1256, as detailed in Violations 40 and 41 in Appendix A.

171.    WeylChem's maintenance wastewater plan was incomplete thus violating 40 C.F.R. § 63.1256(a)(4)(i), as detailed in Violation 42 in Appendix A.

172.    WeylChem failed to designate the effluent from scrubbers as wastewater streams requiring control thereby violating 40 C.F.R. § 63.1256(a)(1)'s requirement to properly identify wastewater requiring control and § 63.1256(a)(2)'s wastewater control requirements, as detailed in Violations 43 and 44 in Appendix A.

173.    WeylChem violated 40 C.F.R. § 63.1252(c) by its failure to monitor heat exchanger systems until late 2007.

174.    Each violation of the Pharmaceutical MACT detailed in paragraphs 149-173 above subjects WeylChem to liability under the CAA.

175.    Unless enjoined by an order of this Court, WeylChem will continue to violate the Pharmaceutical MACT.

176.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), WeylChem is liable for injunctive relief and civil penalties of not more than $25,000 per day for each violation of the Pharmaceutical MACT that occurs on or before January 30, 1997.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, the maximum statutory penalty for violations occurring after January 30, 1997 increased to $27,500 per day for each violation, increased to $32,500 per day for each violation occurring after March 15, 2004, and increased to $37,500 per day for each violation occurring after January 12, 2009.

CLAIMS FOR RELIEF 43-75
(CAA -Pesticide Active Ingredient Production MACT)

177.    Plaintiff realleges and incorporates by reference paragraphs 1 through 147 as if fully set forth herein.

178.    WeylChem failed to submit a complete Initial Notification required by 40 C.F.R. § 63.1368(b) to EPA, as detailed in Violation 47 in Appendix A.

179.    WeylChem failed to submit a complete NOCSR as required by 40 C.F.R. § 63.1368(f), as detailed in Violation 48 in Appendix A.

180.    WeylChem failed to keep appropriate records of operating scenarios for each process, as required by 40 C.F.R §§ 63.1368(f)(4), 63.1368(h)(2), as detailed in Violation 50 in Appendix A.

181.    WeylChem failed to submit complete Periodic reports and failed to submit the reports on schedule, as required by 40 C.F.R. § 63.1368(g), as detailed in Violation 49 in Appendix A.

182.    WeylChem failed to have startup, shutdown and malfunction plans (SSMPs) at the times and for the processes required by 40 C.F.R. § 63.1367(a)(3), as detailed in Violations 1 and 2 in Appendix A.  Moreover, WeylChem failed to revise the plans as required, as detailed in Violation 3 in Appendix A.

183.    WeylChem did not submit appropriate startup, shutdown and malfunction (SSM) event reports, as required by 40 C.F.R. § 63.1368(i), as detailed in Violation 4 in Appendix A.

184.    WeylChem failed to keep records of its inspections of vapor collection systems, closed vent systems, fixed roof, cover, and enclosures, as required by 40 C.F.R. § 63.1367(f)(4) and (6), as detailed in Violation 5 in Appendix A.

185.    WeylChem did not demonstrate compliance with emission limits for process vents through performance testing under worst case conditions, as required by 40 C.F.R. § 63.1362(b), 63.1365(c)(3)(ii)(B), as detailed in Violations 6 and 7 in Appendix A.

186.    WeylChem did not perform an initial compliance test on its process condensors and scrubbers, as required by 40 C.F.R. §§ 63.1362(b), 63.1365(c)(2)(i)(D)(3), 63.1365(c)(3)(iii), as detailed in Violations 8, 9, and 10 in Appendix A.

187.    WeylChem violated 40 C.F.R. § 63.1362(b) by its failure to demonstrate continuing compliance with the process vent standards for process vent emissions, as detailed in Violations 11 and 12 in Appendix A.

188.    WeylChem violated the storage tank standards in 40 C.F.R. § § 63.1362(c)(7), 63.1362(c)(2) as detailed in Violations 13, 14, 16, and 17 in Appendix A.

189.    WeylChem violated the storage tank standards planned routine maintenance requirement of 40 C.F.R. § 63.1362(c)(5), as detailed in Violation 15 in Appendix A.

190.    WeylChem violated the equipment leak standards of 40 C.F.R. § 63.1363(a), as detailed in Violations 18 and 20 in Appendix A.

191.    WeylChem did not adhere to Method 21 when conducting LDAR monitoring, as required by 40 C.F.R. § 63.1363, as detailed in Violation 19 in Appendix A.

192.    WeylChem violated 40 C.F.R. § 63.1363(d)(1)(i) by its failure to equip each open-ended valve or line with a cap, blind flange, plug or second valve, as detailed in Violation 21 in Appendix A.

193.    WeylChem violated 40 C.F.R. § 63.1363(b)(2) by its failure to properly equip its sampling connection systems, as detailed in Violation 22 in Appendix A.

194.    WeylChem violated the monitoring requirements for control devices, as set forth in 40 C.F.R. § 63.1366(b)(8), as detailed in Violation 23 in Appendix A.

195.    WeylChem violated 40 C.F.R. § 63.1366(b)(1) by its failure to calibrate its monitoring devices on an annual basis, as detailed in Violation 25 in Appendix A.

196.    WeylChem failed to conduct an initial compliance demonstration of and to comply with the process vent standards, 40 C.F.R. § 63.1362(b)(2), with regard to regenerative thermal oxidizer (RTO-1)  and scrubber C-39, as detailed in Violations 51, 52 and 53 in Appendix A.

197.    WeylChem failed to develop a complete wastewater sampling plan as required by 40 C.F.R. § 63.1362(d), as detailed in Violation 55 in Appendix A.

198.    WeylChem violated 40 C.F.R. § 63.1362(f) by its failure to monitor heat exchanger systems until late 2007.

199.    Each violation of the PAI MACT detailed in paragraphs 178-198 above subjects WeylChem to liability under the CAA.

200.    Unless enjoined by an order of this Court, WeylChem will continue to violate the PAI MACT.

201.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), WeylChem is liable for injunctive relief and civil penalties of not more than $25,000 per day for each violation of the PAI MACT that occurs on or before January 30, 1997.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, the maximum statutory penalty for violations occurring after January 30, 1997 increased to $27,500 per day for each violation, increased to $32,500 per day for each violation occurring after March 15, 2004, and increased to $37,500 per day for each violation occurring after January 12, 2009.

CLAIMS FOR RELIEF 76-78
(CAA - Benzene Equipment Leak NESHAP)

202.    Plaintiff realleges and incorporates by reference paragraphs 1 through 147 as if fully set forth herein.

203.    WeylChem failed to keep appropriate records of equipment in vacuum service and therefore did not exclude such equipment from its LDAR program, as mandated by 40 C.F.R. §§ 61.242-1(e) and 61.246(e)(5), as detailed in Violation 56 in Appendix A.

204.    WeylChem violated 40 C.F.R. § 61.242-6(a)(1) by its failure to equip each open-ended valve or line with a cap, blind flange, plug or second valve, as detailed in Violation 57 in Appendix A.

205.    WeylChem did not adhere to Method 21 when conducting LDAR monitoring, as required by 40 C.F.R. § 61.245(b)(1), as detailed in Violation 58 in Appendix A.

206.    Each violation of the Benzene Equipment Leak NESHAP detailed in paragraphs 203-205 above subjects WeylChem to liability under the CAA.

207.    Unless enjoined by an order of this Court, WeylChem will continue to violate the Benzene Equipment Leak NESHAP.

208.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), WeylChem is liable for injunctive relief and civil penalties of not more than $25,000 per day for each violation of the Benzene Equipment Leak NESHAP that occurs on or before January 30, 1997.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, the maximum statutory penalty for violations occurring after January 30, 1997 increased to $27,500 per day for each violation, increased to $32,500 per day for each violation occurring after March 15, 2004, and increased to $37,500 per day for each violation occurring after January 12, 2009.

### CLAIM FOR RELIEF 79
(CAA - Benzene Waste NESHAP)

209.    Plaintiff realleges and incorporates by reference paragraphs 1 through 147 as if fully set forth herein.

210.    WeylChem failed to include all waste streams containing benzene in its determination of total annual benzene quantity in its annual report required under the Benzene Waste NESHAP, as required by 40 C.F.R. § 61.357(a), as detailed in Violation 59 in Appendix A.

211.    Each violation of  the  Benzene Waste NESHAP detailed in paragraph 210 above subjects WeylChem to liability under the CAA.

212.    Unless enjoined by an order of this Court, WeylChem will continue to violate the Benzene Waste NESHAP.

213.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), WeylChem is liable for injunctive relief and civil penalties of not more than $25,000 per day for each violation of the Benzene Waste NESHAP that occurs on or before January 30, 1997.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C.

§ 3701, the maximum statutory penalty for violations occurring after January 30, 1997 increased to $27,500 per day for each violation, increased to $32,500 per day for each violation occurring after March 15, 2004, and increased to $37,500 per day for each violation occurring after January 12, 2009.

<u>CLAIMS FOR RELIEF 80-82</u>
(CAA - MON)

214.    Plaintiff realleges and incorporates by reference paragraphs 1 through 147 as if fully set forth herein.

215.    Weylchem failed to conduct an initial performance test at worst-case conditions on RTO-2 by the date required by the MON, October 7, 2008. 40 C.F.R. § 63.2460(c)(2). Weylchem conducted the test on January 20-21, 2009.

216.    Weylchem failed to conduct an initial performance test at worst-case conditions on C-24 scrubber by the date required by the MON, October 7, 2008. 40 C.F.R. § 63.2460(c)(2). Weylchem conducted the test on January 20-21, 2009.

217.    Weylchem failed to submit a NOCSR with all the required elements. Specifically, Weylchem's NOCSR did not contain: (1) Emission calculations; (2) Performance test(s) results; (3) Operating scenarios according to the definition of an operating scenario in the Pharmaceutical MACT; (4) Description of the worst-case operating and/or testing conditions for control devices; (5) Equipment leak program information; and (6) Statement by the owner or operator as to whether the source has complied with the relevant standard or other requirements.

218.    Each violation of the MON detailed in paragraphs 215-217 above subjects WeylChem to liability under the CAA.

40

219.    Unless enjoined by an order of this Court, WeylChem will continue to violate the MON.

220.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), WeylChem is liable for injunctive relief and civil penalties of not more than $25,000 per day for each violation of the MON that occurs on or before January 30, 1997.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, the maximum statutory penalty for violations occurring after January 30, 1997 increased to $27,500 per day for each violation, increased to $32,500 per day for each violation occurring after March 15, 2004, and increased to $37,500 per day for each violation occurring after January 12, 2009.

<u>CLAIMS FOR RELIEF 83-164</u>
(CAA - Title V Permit)

221.    Plaintiff realleges and incorporates by reference paragraphs 1 through 213 as if fully set forth herein.

222.    Each of WeylChem's violations of the Pharmaceutical MACT, the PAI MACT, the Benzene Equipment Leak NESHAP, and the Benzene Waste NESHAP is also a violation of its Title V permit and is a violation of Section 502(a) of the CAA, 42 U.S.C. § 7661a(a).

223.    Each violation of its Title V permit detailed in paragraph 222 above subjects WeylChem to liability under the CAA.

224.    Unless enjoined by an order of this Court, WeylChem will continue to violate its Title V permit.

225.    Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), WeylChem is liable for injunctive relief and civil penalties of not more than $25,000 per day for each violation of it Title V permit that occurs on or before January 30, 1997.  Pursuant to the Federal Civil Penalties

Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, the maximum statutory penalty for violations occurring after January 30, 1997 increased to $27,500 per day for each violation, increased to $32,500 per day for each violation occurring after March 15, 2004, and increased to $37,500 per day for each violation occurring after January 12, 2009.

<u>CLAIMS FOR RELIEF 165-177</u>
(RCRA - Storage of Hazardous Waste Without a Permit)

226.    Paragraphs 1 through 147 above are re-alleged as if fully set forth herein.

227.    Defendant violated S.C. Code Ann. § 44-56-60(a) and (b) and S.C. Code Ann. Regs. R.61-79.264, 265, and 270, which prohibit the treatment, storage or disposal of any hazardous waste except in accordance with a permit and applicable standards for hazardous waste storage facilities, by storing wastes at the Elgin facility in tanks DS-27, S-26, SR-17, S-27 and SR-11 and in the Elgin water treatment tanks without a permit or interim status and without complying with all applicable standards for hazardous waste storage facilities.

228.    Defendant violated S.C. Code Ann. § 44-56-60(a) and (b) and S.C. Code Ann. Regs. R.61-79.264, 265, and 270, which prohibit the treatment, storage or disposal of any hazardous waste except in accordance with a permit and applicable standards for hazardous waste storage facilities, by storing hazardous wastes in two surface impoundments at the Wateree facility without a permit or interim status and without complying with all applicable standards for hazardous waste storage facilities.

229.    Defendant violated S.C. Code Ann. § 44-56-60(a) and (b) and S.C. Code Ann. Regs. R.61-79.264, 265, and 270, which prohibit the treatment, storage or disposal of any hazardous waste except in accordance with a permit by failing to comply with conditions of a permit exemption found at S.C. Code Ann. Regs. R. 61-79.262.34(a)(1)(i), which incorporates S.C. Code Ann. Regs.

42

R. 61-79.265.173(a), by storing hazardous waste in containers in the less-than-90-day hazardous waste container area that were not properly closed.

230.    Defendant violated S.C. Code Ann. § 44-56-60(a) and (b) and S.C. Code Ann. Regs. R.61-79.264, 265, and 270, which prohibit the treatment, storage or disposal of any hazardous waste except in accordance with a permit by failing to comply with conditions of a permit exemption found at S.C. Code Ann. Regs. R. 61-79.262.34(a)(1)(i), which incorporates S.C. Code Ann. Regs. R. 61-79.265.173(d), by storing hazardous waste in containers that were not labeled with the appropriate hazardous waste number.

231.    Defendant violated S.C. Code Ann. § 44-56-60(a) and (b) and S.C. Code Ann. Regs. R.61-79.264, 265, and 270, which prohibit the treatment, storage or disposal of any hazardous waste except in accordance with a permit by failing to comply with conditions of a permit exemption found at S.C. Code Ann. Regs. R. 61-79.262.34(a)(2), by storing hazardous waste in containers that were not marked with an accumulation start date in the less-than-90-day hazardous waste container storage area.

232.    On information and belief, as evidenced by the lack of inspection records, Defendant violated S.C. Code Ann. § 44-56-60(a) and (b) and S.C. Code Ann. Regs. R.61-79.264, 265, and 270, which prohibit the treatment, storage or disposal of any hazardous waste except in accordance with a permit by failing to comply with conditions of a permit exemption found at S.C. Code Ann. Regs. R. 61-79.262.34(a)(1)(i), which incorporates S.C. Code Ann. Regs. R. 61-79.265.174, by not properly inspecting containers of hazardous waste in the less-than-90-day hazardous waste container storage area.

233.    Defendant violated S.C. Code Ann. § 44-56-60(a) and (b) and S.C. Code Ann. Regs. R.61-79.264, 265, and 270, which prohibit the treatment, storage or disposal of any hazardous waste except in accordance with a permit by failing to comply with conditions of a permit exemption found at S.C. Code Ann. Regs. R. 61-79.262.34(a)(1)(i), which incorporates S.C. Code Ann. Regs. R. 61-79.265.175(a) and (b)(1), by not maintaining adequate secondary containment in the less-than-90-day hazardous waste container storage area.

234.    Defendant violated S.C. Code Ann. § 44-56-60(a) and (b) and S.C. Code Ann. Regs. R.61-79.264, 265, and 270, which prohibit the treatment, storage or disposal of any hazardous waste except in accordance with a permit by failing to comply with conditions of a permit exemption found at S.C. Code Ann. Regs. R. 61-79.262.34(a)(1)(ii), which incorporates S.C. Code Ann. Regs. R. 61-79.265.196, by not removing from service any tank system or secondary containment system (i.e., tanks TSS-229 and TS-27) from which there has been a leak or spill or which is unfit for use.

235.    Defendant violated S.C. Code Ann. § 44-56-60(a) and (b) and S.C. Code Ann. Regs. R.61-79.264, 265, and 270, which prohibit the treatment, storage or disposal of any hazardous waste except in accordance with a permit by failing to comply with conditions of a permit exemption found at S.C. Code Ann. Regs. R. 61-79.262.34(a)(1)(ii), which incorporates S.C. Code Ann. Regs. R. 61-79.265.193(a) and (f), by storing hazardous waste in TSS-229, TS-27, and TSS-64 without the proper secondary containment.

236.    Defendant violated S.C. Code Ann. § 44-56-60(a) and (b) and S.C. Code Ann. Regs. R.61-79.264, 265, and 270, which prohibit the treatment, storage or disposal of any hazardous waste except in accordance with a permit by failing to comply with conditions of a permit exemption found at S.C. Code Ann. Regs. R. 61-79.262.34(a)(1)(ii), which incorporates S.C. Code Ann. Regs.

44

R. 61-79.265.1085(c)(2)(iii)(A) and (c)(3), by operating hazardous waste tanks TSS-229 and TS-27 without properly equipped closure devices and without ensuring that the fixed roof of the tank installed with such device be kept in the closed position.

237.    Defendant violated S.C. Code Ann. § 44-56-60(a) and (b) and S.C. Code Ann. Regs. R.61-79.264, 265, and 270, which prohibit the treatment, storage or disposal of any hazardous waste except in accordance with a permit by failing to comply with conditions of a permit exemption found at S.C. Code Ann. Regs. R. 61-79.262.34(a)(4), which incorporates S.C. Code Ann. Regs. R. 61-79.265.16(c), by failing to conduct annual RCRA training for two employees whose jobs are related to hazardous waste management.

238.    Defendant violated S.C. Code Ann. § 44-56-60(a) and (b) and S.C. Code Ann. Regs. R.61-79.264, 265, and 270, which prohibit the treatment, storage or disposal of any hazardous waste except in accordance with a permit by failing to comply with conditions of a permit exemption found at S.C. Code Ann. Regs. R. 61-79.262.34(a)(1)(ii), which incorporates S.C. Code Ann. Regs. R. 61-79.265.194(b), by failing to use appropriate controls and practices to prevent spills and overflows from tank or secondary containment systems (i.e, tanks TSS-229 and TS-27).

239.    Defendant violated S.C. Code Ann. § 44-56-60(a) and (b) and S.C. Code Ann. Regs. R.61-79.264, 265, and 270, which prohibit the treatment, storage or disposal of any hazardous waste except in accordance with a permit by failing to comply with conditions of a permit exemption found at S.C. Code Ann. Regs. R. 61-79.262.34(a)(4), which incorporates S.C. Code Ann. Regs. R. 61-79.265.31, by failing to maintain and operate its facility (i.e, tanks TSS-229 and TS-27 and the tank at the truck unloading area at the Wateree facility) to minimize the possibility of a fire,

45

explosion or any unplanned sudden or nonsudden release of hazardous waste or hazardous waste constituents to air, soil, or surface water which could threaten human health or the environment.

240.    Defendant violated S.C. Code Ann. § 44-56-60(a) and (b) and S.C. Code Ann. Regs. R.61-79.264, 265, and 270, which prohibit the treatment, storage or disposal of any hazardous waste except in accordance with a permit by failing to clean up any hazardous waste discharge (i.e, discharge from tanks TSS-229 and TS-27 and the tank at the truck unloading area at the Wateree facility ) that occurs during generation or processing or storage so that the hazardous waste discharge no longer presents a hazard to human health or the environment, as required by SCHWRM R.61-79.262.90.

241.    Unless enjoined by the Court, WeylChem will continue to violate RCRA.

242.    Pursuant to Section 3008 of RCRA, 42 U.S.C. § 6928(g), WeylChem is liable for injunctive relief and civil penalties of not more than $25,000 per day for each violation referred to above that occurs on or before January 30, 1997.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, the maximum statutory penalty for violations occurring after January 30, 1997 increased to $27,500 per day for each violation, increased to $32,500 per day for each violation occurring after March 15, 2004, and increased to $37,500 per day for each violation occurring after January 12, 2009.

<u>CLAIMS FOR RELIEF 178-179</u>
(RCRA - Treatment of Hazardous Waste Without a Permit)

243.    Paragraphs 1 through 147 above are re-alleged as if fully set forth herein.

244.    Defendant violated Section 44-56-60 of the S.C. Code Ann. and S.C. Code Ann. Regs. R61-79.264, 265, and 270, which prohibit the treatment, storage or disposal of any hazardous waste except in accordance with a permit and applicable standards for hazardous waste

46

treatment facilities, by the treatment of hazardous waste at the Elgin facility in tanks DS-27, S-26, SR-17, S-27, SR-11 ET-1, T-2000, the degasser tank, the air stripper, and the clarifier without a permit or interim status and without complying with all applicable standards for hazardous waste treatment facilities.

245.    Defendant violated Section 44-56-60 of the S.C. Code Ann. and S.C. Code Ann. Regs. R61-79.264, 265, and 270, which prohibit the treatment, storage or disposal of any hazardous waste except in accordance with a permit and applicable standards for hazardous waste treatment facilities, by treating wastes in two surface impoundments at the Wateree facility without a permit or interim status and without complying with all applicable standards for hazardous waste treatment facilities.

246.    Unless enjoined by the Court, WeylChem will continue to violate RCRA.

247.    Pursuant to Section 3008 of RCRA, 42 U.S.C. § 6928(g), WeylChem is liable for injunctive relief and civil penalties of not more than $25,000 per day for each violation referred to above that occurs on or before January 30, 1997. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, the maximum statutory penalty for violations occurring after January 30, 1997 increased to $27,500 per day for each violation, increased to $32,500 per day for each violation occurring after March 15, 2004, and increased to $37,500 per day for each violation occurring after January 12, 2009.

<u>CLAIMS FOR RELIEF 180-182</u>
(RCRA - Failure to Make Hazardous Waste Determinations)

248.    Paragraphs 1 through 147 above are re-alleged as if fully set forth herein.

249.    S.C. Code Ann. Regs. R.61-79.262.11 requires that a person who generates a solid waste must determine if that waste is a hazardous waste.

47

250. Defendant failed to make a hazardous waste determination for liquids spilling out of a hose near tank TSS-229.

251. Defendant failed to make hazardous waste determinations for all or most shipments of waste from Elgin to Wateree during the time period the air stripper was inoperable, June 29, 2004 to January 26, 2006.

252. Defendant failed to make hazardous waste determinations on February 13, 17, 20, 23, and 27; March 2, 6, 9, 16, 20, 23, and 27; April 3, 17, and 24 and May 1, and 8, 2006 by employing a test method that was not sensitive enough to determine if the waste was hazardous.

253. Defendant failed to make hazardous waste determinations on wastewater generated by the Elgin facility prior to 2008 by failing to identify all points of generation for such wastewaters.

254. Unless enjoined by the Court, WeylChem will continue to violate RCRA.

255. Pursuant to Section 3008 of RCRA, 42 U.S.C. § 6928(g), WeylChem is liable for injunctive relief and civil penalties of not more than $25,000 per day for each violation referred to above that occurs on or before January 30, 1997. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, the maximum statutory penalty for violations occurring after January 30, 1997 increased to $27,500 per day for each violation, increased to $32,500 per day for each violation occurring after March 15, 2004, and increased to $37,500 per day for each violation occurring after January 12, 2009.

<u>CLAIM FOR RELIEF 183</u>
(RCRA - Storage of Hazardous Waste Longer than 90 Days)

256. Paragraphs 1 through 147 above are re-alleged as if fully set forth herein.

48

257. It is unlawful pursuant to Section 44-56-60 of the S.C. Code Ann. to operate a hazardous waste storage facility without a permit. S.C. Code Ann. Regs. R. 61-79.262.34 allows generators to accumulate hazardous waste on-site for 90 days or less without a permit provided certain conditions are met.

258. Defendant stored hazardous waste for 28 days in excess of the 90 days permitted by regulation.

259. Pursuant to Section 3008 of RCRA, 42 U.S.C. § 6928(g), WeylChem is liable for injunctive relief and civil penalties of not more than $25,000 per day for each violation referred to above that occurs on or before January 30, 1997. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, the maximum statutory penalty for violations occurring after January 30, 1997 increased to $27,500 per day for each violation, increased to $32,500 per day for each violation occurring after March 15, 2004, and increased to $37,500 per day for each violation occurring after January 12, 2009.

<u>CLAIM FOR RELIEF 184</u>

(RCRA - Improper Handling of Universal Waste Lamps)

260. Paragraphs 1 through 147 above are re-alleged as if fully set forth herein.

261. S.C. Code Ann. Regs. R. 61-79.273.13(d) requires that small quantity handlers of universal waste lamps contain any lamp in containers or packages that are structurally sound, adequate to prevent breakage, and compatible with the content of the lamps. Such containers and packages must remain closed and must lack evidence of leakage, spillage, or damage that could cause leakage under reasonably foreseeable conditions.

262.     S.C. Code Ann. Regs. R.61-79.273.14(e) requires each lamp or a container or package in which such lamps are contained to be labeled or marked clearly with one of the following phrases: "Universal Waste - Lamp(s)," or "Waste Lamp(s)," or "Used Lamp(s)."

263.     S.C. Code Ann. Regs. R.61-79.273.15(c)(1) requires that small quantity generators of universal wastes who accumulate universal waste be able to demonstrate the length of time that the universal waste has been accumulated from the date it becomes a waste or is received.  The handler may make this demonstration by placing the universal waste in a container and marking or labeling the container with the earliest date that any universal waste in the container became a waste or was received or any other method acceptable under RCRA.

264.     On the day of the 2005 inspection, Defendant had accumulated 13 lamps that were not in closed containers, properly labeled or dated.

265.     Pursuant to Section 3008 of RCRA, 42 U.S.C. § 6928(g), WeylChem is liable for injunctive relief and civil penalties of not more than $25,000 per day for each violation referred to above that occurs on or before January 30, 1997.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, the maximum statutory penalty for violations occurring after January 30, 1997 increased to $27,500 per day for each violation, increased to $32,500 per day for each violation occurring after March 15, 2004, and increased to $37,500 per day for each violation occurring after January 12, 2009.

CLAIM FOR RELIEF 185
(RCRA - Improper Transportation of Hazardous Waste)

266.     Paragraphs 1 through 147 above are re-alleged as if fully set forth herein.

267.     S.C. Code Ann. Regs. R.61-79.262.12(c) provides that a generator may not offer his hazardous waste to transporters or to treatment, storage, or disposal facilities that have not

received an EPA identification number and a SCDHEC permit.  S.C. Code Ann. Regs. R.61-79.262

Subpart B requires a generator who transports, or offers for transport a hazardous waste for offsite

treatment, storage, or disposal to prepare a Manifest (OMB Control number 2050-0039) on EPA

Form 8700-22, and, if necessary, EPA Form 8700-22A, according to the instructions included in the

Appendix to Part 262.

268.    S.C. Code Ann. Regs. R.61-79.262.30 requires a generator to package waste

in accordance with the applicable DOT regulations on packaging under 49 C.F.R. Parts 173, 178,

and 179 and the S.C. Public Service Commission regulations before transporting hazardous waste

or offering hazardous waste for transportation offsite.

269.    S.C. Code Ann. Regs. 61-79.262.31 requires a generator to label each package

in accordance with the applicable S. C. Public Service Commission regulations and DOT regulations

for hazardous materials under 49 C.F.R. Part 172 before transporting or offering hazardous waste

for transportation offsite.

270.    S.C. Code Ann. Regs. R.61-79.262.32(a) requires a generator to mark each

package of hazardous waste in accordance with the applicable S. C. Public Service Commission

regulations and DOT regulations on hazardous materials under 49 C.F.R. Part 172 before

transporting or offering hazardous waste for transportation offsite.

271.    S.C. Code Ann. Regs. R.61-79.262.33 requires a generator to placard or offer

the initial transporter the appropriate placards according to DOT regulations for hazardous materials

under 49 C.F.R. Part 172, Subpart F and the S. C. Public Service Commission regulations before

transporting hazardous waste or offering hazardous waste for transportation off-site.  If placards are

not required, a generator must mark each motor vehicle according to 49 C.F.R § 171.3(b)(1).

272.    During the entire time that Defendant's waste stream contained hazardous waste, which was at least from December 15, 2005 through January 24, 2006, Defendant's shipment of the wastewater from Elgin to Wateree violated the regulations set forth in paragraphs 267 to 271 above.

273.    Unless enjoined by the Court, WeylChem will continue to violate RCRA.

274.    Pursuant to Section 3008 of RCRA, 42 U.S.C. § 6928(g), WeylChem is liable for injunctive relief and civil penalties of not more than $25,000 per day for each violation referred to above that occurs on or before January 30, 1997. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, the maximum statutory penalty for violations occurring after January 30, 1997 increased to $27,500 per day for each violation, increased to $32,500 per day for each violation occurring after March 15, 2004, and increased to $37,500 per day for each violation occurring after January 12, 2009.

CLAIMS FOR RELIEF 186-187
(CWA - NPDES Permit Violations)

275.    Paragraphs 1 through 147 above are re-alleged as if fully set forth herein.

276.    WeylChem violated its NPDES permit on numerous occasions from April 2002 to the present, as set forth in Appendix B to this Complaint, by discharging pollutants from its outfall in concentrations or mass that exceeded the applicable permit effluent limitations.

277.    WeylChem violated the terms of its NPDES permit by not properly operating and maintaining all facilities of treatment and control (and related appurtenances) which are installed or used by the permittee to achieve compliance with the terms and conditions of the permit, as specifically demonstrated by the findings of EPA's 2006 and 2009 inspections of the Wateree facility.

278.    Each discharge of pollutants in excess of the limitations in the NPDES permit and each day of improper operation and maintenance of its facilities of treatment and control constitute separate violations of the terms of WeylChem's NPDES permit.

279.    Each violation of the NPDES permit subjects WeylChem to liability under Section 309(b) of the Clean Water Act.

280.    Unless enjoined by the Court, WeylChem will continue to violate the terms of its NPDES permit.

281.    Pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), WeylChem is liable for injunctive relief and civil penalties of not more than $25,000 per day for each violation of its NPDES permit that occurs on or before January 30, 1997.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, the maximum statutory penalty for violations occurring after January 30, 1997 increased to $27,500 per day for each violation, increased to $32,500 per day for each violation occurring after March 15, 2004, and increased to $37,500 per day for each violation occurring after January 12, 2009.

CLAIM FOR RELIEF 188
(CWA - Discharge Without a Permit)

282.    Paragraphs 1 through 147 above are re-alleged as if fully set forth herein.

283.    WeylChem violated Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), by discharging pollutants from an unauthorized outfall into the Wateree River from April 2009 to at least November 2011.

284.    Each discharge of pollutants without a permit constitutes a separate violation of the Clean Water Act.

285.    Each violation of Section 301(a) subjects WeylChem to liability under Section 309(b) of the Clean Water Act.

286.    Unless enjoined by the Court, WeylChem will continue to violate the CWA.

287.    Pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), WeylChem is liable for injunctive relief and civil penalties of not more than $25,000 per day for each violation of its NPDES permit that occurs on or before January 30, 1997.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, the maximum statutory penalty for violations occurring after January 30, 1997 increased to $27,500 per day for each violation, increased to $32,500 per day for each violation occurring after March 15, 2004, and increased to $37,500 per day for each violation occurring after January 12, 2009.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, the United States respectfully requests that the Court:

1.    Permanently enjoin WeylChem from operating in violation of the CAA and 40 C.F.R. Part 63, Subparts GGG (pharmaceuticals production), MMM (pesticide active ingredient production) and FFFF (miscellaneous organic chemical manufacturing); and Part 61 (national emission standards for hazardous air pollutants), Subparts J (Equipment Leaks (fugitive emission sources) of benzene) and FF (benzene waste operations), and its Title V permit; of RCRA, the South Carolina Hazardous Waste Management Act and the regulations promulgated thereunder; and of the CWA;

2.    Order WeylChem to remedy past violations and undertake appropriate corrective action, as necessary;

54

3.       Assess civil penalties, not to exceed the applicable statutory maximum for past violations of the CAA, RCRA, and the CWA and any regulations promulgated thereunder and any permits issued thereunder;

4.       Award plaintiff its costs and disbursements for this action; and

5.       Award such other relief as is just and proper.

(SIGNATURE ON FOLLOWING PAGE)

Respectfully submitted,

WILLIAM N. NETTLES
United States Attorney
District of South Carolina


S/ JAMES C. LEVENTIS, JR
JAMES C. LEVENTIS, JR. (#9406)
Assistant United States Attorney
1441 Main Street, Suite 500
Columbia, SC 29201
(803) 929-3000


IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

LORI JONAS
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-4080

Of Counsel:
ELLEN ROUCH
Associate Regional Counsel
BONNIE SAWYER
Associate Regional Counsel
MICHELE WETHERINGTON
Assistant Regional Counsel
Office of Regional Counsel
U.S. EPA, Region 4
61 Forsyth Street, S.W.
Atlanta, Georgia  30303

December 27, 2012

56